## Ralph BLANN v. HARVILL-BYRD ELECTRIC CO.
### ET AL

5-5328          459 S. W. 2d 267

### Opinion delivered November 16, 1970

*Whetstone & Whetstone,* for appellant.

*John M. Lofton, Jr.,* for appellees.

J. Fred Jones, Justice. This is a workmen's compensation case in which the claimant-appellant, Mr. Blann, suffered a compensable heart attack on May 25, 1967, while carrying tools weighing 45 to 50 pounds up some steps in the course of his employment as an electrician by Harvill-Byrd Electric Company. Mr. Blann filed a claim for permanent and total disability. A hearing before a referee on April 9, 1968, resulted in an award of 15% permanent partial disability to the body as a whole. The award was sustained by the full Commission and affirmed by the circuit court on appeal. Mr. Blann has appealed to this court and relies on the following points for reversal:

"There was no substantial evidence to support the finding that appellant was not totally and perma-

nently disabled.

There was no substantial evidence to support the findings that appellant was not permanently disabled from earning 'high time' which would entitle him to maximum benefits under the act."

Following his heart attack on May 25, 1967, Mr. Blann went to Dr. B. B. Livingston in Camden, who recommended that he go to the hospital. On May 29, 1967, he went to the Veterans Administration Hospital in Little Rock where electrocardiograms were made, and where he remained under treatment and observation for about 28 days. Mr. Blann testified that after his release from the hospital, he tried installing some light fixtures in a school building in El Dorado but had to quit because of his heart condition. He testified that he then tried a maintenance job at Helena and was able to work only 10 or 12 days. He says that while working in Helena he was asked to climb a chemical tank and unstick an elevator on top of the tank about 165 feet above the ground, and when he had climbed about 25 feet, his heart started bothering him and he had to come back down. He testified that he was discharged the next day and didn't work any more until September. He testified that he was examined by Dr. Ellis in El Dorado on September 14, 1967, and on or about September 15, 1967, he went to work for the Alleghaney Electric Company on a paper mill job in Alexandria, Louisiana.

At the hearing before the referee on April 9, 1968, Mr. Blann testified that with the exception of one week when he was out of work because of Union trouble, he had not missed a single day's work from the time he went to work for Alleghaney in April, 1967, until the day of the hearing. He testified that he has not seen a doctor since he last saw Dr. Ellis in September, 1967, and has received no medical attention. He says, however, that he carries nitroglycerin tablets in his pocket and takes them when he experiences chest pain. He testified that he is now restricted to ground work and has been unable to work above 40 feet in height, which demands extra

pay called "high time."

Mr. Allen O. Hobbs, business manager of the Electrician's Union in El Dorado, testified that in that area the wage scale for journeymen electricians is $5 per hour and that "high time" would be $7.50 per hour. He testified that "high time," under the Union contract, refers to work on towers, steeples, smokestacks, and other similar hazardous locations. He testified that "high time" is usually available on big jobs but that locally, in the residential shops, there wouldn't be any. He says that on large industrial jobs "high time" would probably constitute 20% of the wages on a year in year out basis.

Dr. Ellis testified that he examined Mr. Blann on September 14, 1967, and primarily from the history and symptoms related to him, he tentatively diagnosed Mr. Blann's condition as arteriosclerotic heart disease consistent with angina; that at that time he was of the opinion Mr. Blann had suffered some permanent partial disability but was of the opinion that it would take approximately one year to determine what Mr. Blann's ultimate condition would likely be. On January 4, 1968, Dr. Ellis made a written report of his findings on September 14, 1967. He interpreted his own electrocardiograms as revealing no definite abnormalities, but interpreted the electrocardiograms performed in May and June at the Veterans Hospital, as indicating abnormalities consistent with infarction of the anterior myocardial wall. Dr. Ellis concludes his written report as follows:

"It is my opinion that this patient has arteriosclerotic heart disease. It is also my opinion that he sustained a myocardial infarction in May, 1967. I believe that he continues having angina pectoris secondary to arteriosclerotic heart disease and that his physical output should be limited to tolerance. I would not want to perform an exercise tolerance test to ascertain this diagnosis at this time.

I believe that Mr. Blann should not perform manual

labor which would involve more than the use of such instruments as pliers and screwdrivers at ground level for the next year. I do not think that he should climb ladders or stairs in the performance of his duties for the next year. I believe that any work involving the lifting or carrying of more than ten to fifteen pounds should be prohibited for the next year. His cardiac functional and therapeutic classification, in my opinion, is III-C."

On February 16, in answer to inquiries made by the compensation carrier to Mr. Blann's attorney and forwarded on to Dr. Ellis, he reported as follows:

"Regarding your question as to whether the healing period has or has not ended, I believe that the healing period of the condition has not occurred yet. I believe that it will take approximately one year for me to determine what the patient's ultimate condition will likely be.

Regarding your next question as to the determination of permanent partial disability, I believe that Mr. Blann is permanently disabled partially. I consider him 100% disabled permanently from the standpoint of his doing any work on any high level. I further consider him 100% disabled from the standpoint of his performing manual activity that would involve any strenuous physical exertion at any level. I believe that he has no disability relative to his performing sedentary or semi-sedentary work or so-called 'light Work.' "

Dr. Alfred Kahn, Jr. examined Mr. Blann and recommended that he should continue to perform light work. After explaining that "angina pectoris" is warning pains which warn an individual that he is putting more work on his heart than his heart will tolerate, Dr. Kahn testified that a heart patient, such as Mr. Blann, should avoid extremes in temperature and fatigue and should exercise to the point of *almost* inducing pain because of angina pectoris. He testified that exercise is

not injurious, but actually prolongs life, if properly administered. He testified that the tracings on electro-cardiograms should show definite evidence of coronary artery occlusion, which is the closure of the blood vessel leading to the muscle, and that he detected some muscle death on the tracings made at the Veterans Hospital. He testified, however, that in his opinion, the tracings made at the Veterans Hospital did not indicate a very large area of damaged muscle because the electrocardiograms made at his own office are now normal. Dr. Kahn testi-fied, in part, as follows:

"Q. Would you recommend that he refrain from lifting?

A. Well, I think a limit on that might be five pounds.

Q. What about climbing, like a ladder?

A. Slowly. If he wanted to climb a ladder slowly I guess it would be safe enough, but I wouldn't recommend that he do it very often. I wouldn't recommend that he do it to the extent of producing pain. * * * I would say a man who has angina pectoris could perform light work as an electrician, if he did not lift more than five pounds, if he did not have to climb fre-quently, if he did not get over-fatigued, or exposed to extremes of temperature. I think this is a better way to put it. I'm trying to state it positively for you. * * * This gentle-man is probably capable of working within the restrictions that I've mentioned to you, and within these restrictions he's probably just as well off working as he is sitting at home. Exercise, if not overdone, is beneficial to a man such as this."

Dr. Kahn testified that the fact that Mr. Blann had worked continuously from September 19, 1967, with-out losing any time because of his heart condition,

would indicate his capability for doing the work he did, and that as long as he did not go beyond reasonable limits, he felt that Mr. Blann could continue in the course of his employment as a journeyman electrician until warned by angina pain.

Mr. Blann testified before the full Commission that he had to quit working for Alleghaney when the work consisted of putting rigid steel conduits underground, and that he was made foreman over a crew of men and was unable to do the walking and climbing necessary in laying out the work for the men. He testified that he worried a lot about not being able to carry out his work, and that was the reason for his leaving Alleghaney for the 30 day period he did not work for Alleghaney. He says that after leaving Alleghaney he went to work for Lawrence Electric Company and worked for a week or ten days "hanging piano wires" in boilers. He says that he was making $5.40 per hour for this work and quit when the wire hanging was completed and the electricians had to climb on top of the boiler. He says that he could not do the climbing required by Lawrence Electric, so he went back to Alleghaney when they had finished laying the heavy conduits in the wood yard and light work was again available.

Mr. Blann testified that when he went back to work for Alleghaney, "high time" work was available to him but he was unable to accept it. He says that "high time" was available to him from 30 to 35% of the time, but that he has been unable to do "high time" since he had his heart attack. He testified that any work over 40 feet above the ground that is not on a permanent deck or a permanent platform where handrails are required is considered "high time." He testified that he had worked as a lineman and a wireman prior to his heart attack; that he is now unable to do the climbing necessary for that type of work, and that his work is now strictly limited to that of an electrician. He testified, however, that the work of a lineman and that of an electrician are practically the same except that a lineman does not draw "high time" pay. Mr. Blann testified

that he was earning $4.85 an hour when he had his heart attack and is now making $5.40 an hour He testified, however, that the reason he had been able to continue his work without losing any time was because he was acquanted with the men on the job and they would assist him when his work required something that he could not do.

Mr. Blann's first point deserves little comment in the light of the record in this case. According to the medical reports and testimony, Mr. Blann is able to do light work; and according to Mr. Blann's own testimony, he had been doing light work without loss of time and without the necessity for medical treatment since he returned to work for Alleghaney in June, 1967. There is substantial evidence that the disability Mr. Blann does have is not totally disabling, and there is no substantial evidence to the contrary.

Mr. Blann presents a rather unique theory under his second point. He seems to contend that since he is no longer able to earn extra pay for high and hazardous work, and since such work was available to him in such quantity, that 65% of the amount he could earn in extra pay, would exceed the maximum weekly benefits he could receive under the law; he is totally disabled and should be paid the maximum weekly compensation benefits as long as he remains unable to earn "high time," or extra pay at the high and hazardous work. The Arkansas Workmen's Compensation Law does not sustain Mr. Blann in this contention.

Ark. Stat. Ann. § 81-1302 (e) (Repl. 1960) defines "disability" as follows:

" 'Disability' means incapacity because of injury to earn, in the same or any other employment, the wages which the employee was receiving at the time of the injury."

and Ark. Stat. Ann. § 81-1312 (Repl. 1960) provides as follows:

"Compensation shall be computed on the average weekly wage earned by the employee under the contract of hire in force at the time of accident, and in no case shall be computed on less than a full time work week in the employment. Where the injured employee was working on a piece basis, the average weekly wage shall be determined by dividing the earnings of the employee by the number of hours required to earn the wages, during the period not to exceed fifty-two [52] weeks preceding the week in which the accident occurred, and by multiplying this hourly wage by the number of hours in a full time work week in the employment. Overtime earnings are to be added to the regular weekly wages and shall be computed by dividing the overtime earnings by the number of weeks worked by the employee in the same employment under the contract of hire in force at the time of the accident, not to exceed a period of fifty-two [52] weeks preceding the accident. If, because of exceptional circumstances, the average weekly wage cannot be fairly and justly determined by the above formulas, the Commission may determine the average weekly wage by a method that is just and fair to all parties concerned."

The mere fact that an injured employee *is earning*, in the same or other employment, the wages he was receiving at the time of his injury does not necessarily prove that he has the *capacity* to do so. (*Abbott* v. *C. H. Leavell & Co.*, 244 Ark. 544, 426 S. W. 2d 166). But Mr. Blann is not an uneducated common laborer whose capacity to earn is dependent upon a strong body; he is a journeyman electrician with 22 years experience. His capacity to earn is based as much on what he knows as it is on strenuous physical exertion. Compensation for *temporary partial* disability is provided for in Ark. Stat. Ann. § 81-1313 (b) (Repl. 1960) as follows:

"In case of temporary partial disability resulting in the decrease of the injured employee's average weekly wage, there shall be paid to the employee sixty-

five per centum [65%] of the difference between the employee's average weekly wage prior to the accident and his wage earning capacity after the injury."

Compensation for *permanent scheduled* injuries is provided for in § 81-1313 (c), and compensation for *permanent partial* disability is provided for in subsection (d) as follows:

"A permanent partial disability not scheduled in subsection (c) hereof shall be apportioned to the body as a whole, which shall have a value of 450 weeks, and there shall be paid compensation to the injured employee for the proportionate loss of use of the body as a whole resulting from the injury."

Now, applying the statute to the case at bar, it was stipulated that Mr. Blann's hourly wage under his contract of hire at the time of his injury was $4.75 per hour, but there is no substantial evidence as to what his average weekly wage was prior to his injury. There is substantial evidence that because of his injury Mr. Blann did lose some of his capacity to work in high and dangerous places, but there is no substantial evidence that this loss decreased his earning capacity beyond the 15% awarded to him by the Commission.

The judgment is affirmed.